(Slip Opinion)

# Whether FCC's Lifeline Program is a Benefit Subject to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996

The Federal Communications Commission's Lifeline program provides federal means-tested public benefits and must therefore comply with the eligibility restrictions set forth in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996.

Collecting a subscriber's Social Security Number before enrollment is not sufficient to verify noncitizen eligibility for participation in the Lifeline program.

May 28, 2026

MEMORANDUM OPINION FOR BRENDAN CARR
CHAIRMAN
FEDERAL COMMUNICATIONS COMMISSION

Since 1985, the Lifeline program of the Federal Communications Commission ("FCC") has offered monthly discounts on telephone service for qualifying low-income consumers. *See* 47 U.S.C. § 254(j); 47 C.F.R. §§ 54.400–54.424. FCC expanded the availability of this support to internet service in 2016. *See Lifeline & Link Up Reform & Modernization*, 31 FCC Rcd. 3962 (2016). Under existing rules, an applicant must provide only basic identification information to apply for benefits.

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (codified in relevant part as amended 8 U.S.C. § 1601 *et seq.*), limits "Federal public benefits" to U.S. citizens and "qualified" aliens, 8 U.S.C. § 1611. And it restricts most aliens who have been in the country for fewer than five years from receiving "Federal means-tested public benefit[s]." *Id.* § 1613.

You have asked whether consumer discounts delivered through FCC's Lifeline program constitute a "Federal public benefit" or a "Federal means-tested public benefit" under PRWORA. If they do, you have also asked whether collecting a benefit recipient's Social Security Number is sufficient to verify aliens' eligibility for the Lifeline program. We conclude that the Lifeline benefit meets both statutory definitions under PRWORA. Consequently, compliance with PRWORA requires more than merely collecting a subscriber's Social Security Number before enrolling them into the program.

# I.

## A.

Congress established FCC in 1934 and directed it "to make available, so far as possible, to all the people of the United States" communications service "at reasonable charges." Communications Act of 1934, § 1, Pub. L. No. 73-416, 48 Stat. 1064, 1064 (codified as amended at 47 U.S.C. § 151). This objective later became known as "universal service." 47 U.S.C. § 254. The Communications Act authorizes FCC to perform all acts through rulemaking and adjudicatory orders "as may be necessary in the execution of [FCC] functions." *Id.* § 154(*i*).

FCC created Lifeline in 1985 to promote universal service for low-income consumers. *See* MTS and WATS Market Structure; and Establishment of a Joint Board; Amendment, 50 Fed. Reg. 939 (Jan. 8, 1985). FCC asserted that telephone service is a utility that is "crucial to full participation" in society and that serves as a "lifeline to the outside world." *Id.* at 941. To ensure that cost would not prevent access to such service, the Lifeline program provided a monthly discount on landline telephone service for low-income households. *Id.* at 942.

Over a decade later, Congress ratified the Lifeline program in the Telecommunications Act of 1996. *See* Pub. L. No. 104-104, § 101(a), 110 Stat. 56, 75 (codified as amended at 47 U.S.C. § 254(j)). Congress refined FCC's objectives by defining universal service as an "evolving level of telecommunications services" that is "supported by Federal universal service support mechanisms." 47 U.S.C. § 254(c). Congress further tasked FCC with "establish[ing]" such service to the extent "essential to education, public health, or public safety," "consistent with the public interest, convenience and necessity," and other criteria. *Id.* FCC continues to enjoy broad discretion in crafting programs that promote universal service. *See id.* § 254(b) (enumerating "[u]niversal service principles" on which FCC must base its programs).

Universal service programs are funded by the Universal Service Fund ("USF"). *See id.* § 254(d); 47 C.F.R. § 54.702(a), (n). All telecommunications carriers that provide "interstate telecommunications services" must financially contribute to the USF on a quarterly basis. *See* 47 U.S.C.

§ 254(d); 47 C.F.R. § 54.709(a).[1] Certain other "providers of interstate telecommunications" must also contribute to the USF. 47 U.S.C. § 254(d); 47 C.F.R. § 54.706(a). A provider that fails to timely submit its contributions will incur additional fees for the delinquency and may be subject to FCC enforcement action. 47 C.F.R. § 54.713(a)–(c). The amount each provider must contribute is determined by a formula called the "contribution factor." *Id.* § 54.709(a). The contribution factor can be expressed as a fraction, where the numerator is the USF's projected expenses for the upcoming quarter and the denominator is the total projected interstate and international telecommunications revenues of contributing carriers during that same period. *See id.* § 54.709(a)(2).

The Universal Service Administrative Company ("USAC") assists FCC with determining the value of certain variables involved in the contribution-factor formula. USAC is a "not-for-profit corporation owned by an association of carriers." *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2495 (2025). FCC "appointed" USAC to serve as "Administrator" of the USF. 47 C.F.R. § 54.701(a). USAC's "sole purpose is to assist the FCC in the administration of the USF programs . . . as an agent and instrumentality of the FCC." Memorandum of Understanding Between the Federal Communications Commission and the Universal Service Administrative Company at 2 (Oct. 17, 2024) ("USAC MOU"), https://www.fcc.gov/sites/default/files/usac-mou.pdf [https://perma.cc/HSJ6-SPSA]. USAC calculates the USF's quarterly projected expenses and total revenue of all USF contributors and submits them to FCC for final approval. *See* 47 C.F.R. § 54.709(a)(2)–(3).

After the quarterly contribution factor is established, USAC collects USF contributions on FCC's behalf. *Id.* § 54.702(b). The contributions are deposited into a U.S. Treasury account. USAC MOU at 2–3, 13. From this account, USAC redistributes USF monies to fund USF programs in accordance with FCC rules governing the programs. *See* 47 C.F.R. § 54.702(b). Payment from the Treasury requires approval by a certifying officer at FCC, *see* 31 U.S.C. § 3528, and as such, USAC makes only recommendations for payment.

---

[1] FCC permits USF contributors to pass along USF charges to consumers. 47 C.F.R. § 54.712(a).

**B.**

Today, Lifeline is one of four USF programs.[2] In its present form, Lifeline offers a nontransferable discount set by FCC for telephone and broadband internet services. *See* 47 C.F.R. § 54.401(a). USAC reimburses the eligible telecommunications carrier a "Lifeline support amount" for every enrolled Lifeline consumer. *Id.* § 54.403(a)–(b). USAC currently reimburses Lifeline providers up to $9.25 per month per enrolled consumer for broadband or bundled voice and broadband service, and up to $5.25 per month for voice-only service. *Id.* § 54.403(a). Lifeline providers receive an additional reimbursement of up to $25 per month per enrolled consumer who resides on qualifying Tribal lands. *Id.* § 54.403(a)(3). According to USAC, about 8.06 million subscribers were enrolled in the Lifeline program as of December 2025. *See* USAC, *Program Data*, https://www.usac.org/lifeline/resources/program-data/#Participation [https://perma.cc/F4AR-B2TF] (last accessed May 28, 2026).

A carrier seeking to participate in the program must first be designated as an "eligible telecommunications carrier" by FCC or the state commission of the state in which the carrier provides the service. 47 U.S.C. § 214(e). Eligible telecommunications carriers have a host of responsibilities, including publicizing "the availability of Lifeline service in a manner reasonably designed to reach those likely to qualify for the service." 47 C.F.R. § 54.405(b).

Even after being designated an eligible telecommunications carrier, a service provider may not seek reimbursement for providing Lifeline service to a particular consumer until the "eligibility determination and certification" for that consumer has been completed. *Id.* § 54.410(a)(2). To be eligible for the Lifeline program, a prospective consumer must be a "qualifying low-income consumer." *Id.* § 54.409(a). Consumers typically qualify in one of three ways.[3] The first way is by having a household

---

[2] The other three USF programs are the High-Cost Support program, 47 C.F.R. §§ 54.302–54.322, the Rural Health Care program, *id.* §§ 54.600–54.633, and the E-Rate program for schools and libraries, *id.* §§ 54.500–54.523. As these programs fall outside the scope of your query, we do not discuss them here.

[3] A fourth way of satisfying the "qualifying low-income consumer" requirement is as a victim of domestic abuse. *See* 47 C.F.R. § 54.409(a)(3). Unlike the general Lifeline

income that is "at or below 135% of the Federal Poverty Guidelines for a household of that size." *Id.* § 54.409(a)(1). The second way is as a consumer whose household is already enrolled in a qualifying federal assistance program. *Id.* § 54.409(a)(2).[4] And the third way is as a resident of a qualifying Tribal land who meets the general qualifications under the prior two definitions, or who has at least one member of his household that participates in a qualifying Tribal-specific federal assistance program. *Id.* § 54.409(b).[5] A prospective consumer who satisfies this third definition qualifies for an enhanced Lifeline benefit—a discount totaling up to $34.25 for broadband or bundled voice and broadband service, instead of the usual monthly discount of up to $9.25. *See id.* § 54.403(a)(3).

Most eligibility determinations are made, in part, by the National Lifeline Eligibility Verifier ("National Verifier"). *See id.* §§ 54.400(o), 54.410(b)(2), 54.410(c)(2).[6] Prospective consumers ("subscribers") certify their eligibility by filling out a form on which the subscribers must supply personal information aligning with the program's eligibility criteria and declare under penalty of perjury that the personal information is accurate. *See id.* § 54.410(d) (requiring that an enrollment form include, among other things, the subscriber's full name, address, date of birth, and last four digits of his Social Security Number).[7] The National

---

program, such consumers qualify for only a temporary, emergency service that lasts no more than six months. *Id.* § 54.424(b).

[4] Qualifying federal assistance programs are "Medicaid; Supplemental Nutrition Assistance Program; Supplemental Security Income; Federal Public Housing Assistance; or Veterans and Survivors Pension Benefit." 47 C.F.R. § 54.409(a)(2).

[5] "Tribal lands" is defined by regulation. *See* 47 C.F.R. § 54.400(e). The qualifying Tribal-specific federal assistance programs are "Bureau of Indian Affairs general assistance; Tribally administered Temporary Assistance for Needy Families; Head Start (only those households meeting its income qualifying standard); or the Food Distribution Program on Indian Reservations." *Id.* § 54.409(b).

[6] The National Verifier is part of the default method for making eligibility determinations. *See* 47 C.F.R. § 54.410(a). A state, however, may choose to use its own process for verifying eligibility if the process has been certified by FCC. *Id.* Currently, two states—Oregon and Texas—do not rely on the National Verifier. *See* USAC, *National Verifier December 20, 2019 Launch*, https://www.usac.org/lifeline/national-verifier/how-to-use-nv/launches/national-verifier-opt-out-launch/ [https://perma.cc/L72E-NKF4] (last accessed May 15, 2026).

[7] A prospective subscriber may provide his Tribal identification number in lieu of a Social Security Number. 47 C.F.R. § 54.410(d)(2)(vi).

Verifier checks subscriber information against state and federal databases to verify program eligibility and to ensure that no household member of the subscriber is already receiving Lifeline benefits. USAC, *Eligibility Verification*, https://www.usac.org/lifeline/national-verifier/eligibility-verification/ [https://perma.cc/AS8B-U6F4] (last accessed May 14, 2026). The National Verifier re-certifies subscribers' eligibility annually. *See* 47 C.F.R. § 54.410(f). Neither the eligibility nor the certification process requires separately proving citizenship or immigration status.

## C.

In 1996, a bipartisan Congress enacted comprehensive welfare-reform legislation known as PRWORA. Among other things, that law clarified that the immigration policy of the United States was (and continues to be) that "aliens within the Nation's borders not depend on public resources to meet their needs" and that "the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2)(A)–(B). Congress found that the patchwork system of eligibility requirements for federal-benefit programs before PRWORA's enactment "proved wholly incapable of assuring that individual aliens [do] not burden the public benefits system." *Id.* § 1601(4). Congress enacted PRWORA to resolve this issue by "establish[ing] a set of restrictive, uniform rules that would apply across a broad spectrum of federal benefit programs." *Harmonizing the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and Section 214 of the Housing and Community Development Act of 1980*, 50 Op. O.L.C. __, at *3 (Feb. 18, 2026) ("*Harmonizing PRWORA and Section 214*") (citation omitted).

To that end, PRWORA limits "Federal public benefits" to U.S. citizens and "qualified" aliens. 8 U.S.C. § 1611. PRWORA contemplates several types of "qualified" aliens. These categories include lawful permanent residents, *see id.* § 1641(b)(1); asylees, *see id.* § 1641(b)(2); refugees, *see id.* § 1641(b)(3), (b)(6); humanitarian parolees, *see id.* § 1641(b)(4); aliens granted withholding of removal, *see id.* § 1641(b)(5); Cuban and Haitian entrants, *see id.* § 1641(b)(7); resident aliens from Freely Associated States, *see id.* § 1641(b)(8); and battered spouses and children of

U.S. citizens or lawful permanent residents under the Violence Against Women Act of 1994, *see id.* § 1641(c).

PRWORA broadly defines "Federal public benefit" to include "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." *Id.* § 1611(c)(1)(B). PRWORA further provides that qualified aliens are generally ineligible for "any Federal means-tested public benefit" unless they have been in the United States for at least five years with a qualified status. *Id.* § 1613(a). Although PRWORA does not define "Federal means-tested public benefit," this Office recently interpreted the phrase as including "any federal public benefit for which the eligibility of an individual, household, or family eligibility unit for benefits, or the amount of such benefits, or both, are determined on the basis of the income, resources, or financial need of the individual, household, or unit." *Interpretation of "Federal Means-Tested Benefit" in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, 49 Op. O.L.C. __, at *8 (Dec. 16, 2025) ("*Means-Tested Benefits*").

## II.

PRWORA's eligibility and verification requirements apply to Lifeline consumers because the Lifeline benefit satisfies the definitions of both a "Federal public benefit" and a "Federal means-tested public benefit."

## A.

The Lifeline benefit qualifies as a "Federal public benefit" under PRWORA, as both FCC and the Supreme Court have recognized. *See* 47 C.F.R. § 54.410(d)(1)(i) ("Lifeline is a federal benefit."); *Consumers' Rsch.*, 145 S. Ct. at 2500 ("Universal service is of course a public benefit."). As shown below, that recognition is warranted. A "Federal public benefit" is "any . . . welfare . . . or any other similar benefit for which payments or assistance are provided to an individual, household, or family

eligibility unit by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1).

### 1.

To start, the Lifeline program is "welfare" or a "similar benefit." Because PRWORA does not define welfare, the word should be given its "ordinary meaning." *See Wis. Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498, 505 (2025). "Welfare" is public assistance, usually in the form of direct payments or discounted services, for someone in need. *See Black's Law Dictionary* 1588 (7th ed. 1999) ("A system of social insurance providing assistance to those who are financially in need, as by providing food stamps and family allowances."); *see also Goldberg v. Kelly*, 397 U.S. 254, 264 (1970) ("For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care."). Lifeline provides a form of public assistance by discounting the cost of telephone and broadband internet services. This assistance is limited to those in financial need, as determined based on income or participation in another federal assistance program that is limited to those in financial need. *See* 47 C.F.R. § 54.409(a)–(b); *see also* Part II.B.

A broad interpretation of "welfare" and "similar benefit[s]" is consistent with Congress's capacious definition of Federal public benefits in 8 U.S.C. § 1611(c). Although "food assistance" and "disability" benefits could also be characterized as types of welfare, *id.*, "sometimes the better overall reading of the statute contains some redundancy," *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020) (cleaned up). Here, "Congress employed a belt and suspenders approach to make sure that *all*" forms of public assistance—unless specifically excluded—would be subject to PRWORA's restrictions. *Id.*[8]

---

[8] The Lifeline program does not fall within the statutory exclusions from the definition of a "Federal public benefit." 8 U.S.C. § 1611(c)(2). Nor is it excepted as a "program[], service[], or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General" to "deliver in-kind services at a community level," that "does not condition the provision of assistance . . . on the individual recipient's income or resources," and that is "necessary for the protection of life or

The Lifeline benefit is also a "payment" or form of "assistance" that is "provided to an individual, household, or family eligibility unit." 8 U.S.C. § 1611(c)(1)(B). This is because the Lifeline benefit is a discount that is applied to a subscriber's bill. *See* 47 C.F.R. § 54.403(b). Lifeline providers must apply this discount because they accept reimbursement from USAC. *Id.* § 54.403(a)–(b). Finally, the Lifeline discount is "provided to an individual" and is limited to one per household. *Id.* § 54.409(a) (defining "qualifying low-income consumer" as recipient); *id.* § 54.409(c) (imposing one-per-household limitation).

## 2.

Next, notwithstanding that it is nominally funded by regulated entities, Lifeline is a "benefit for which payments or assistance are provided . . . by *appropriated funds* of the United States." 8 U.S.C. § 1611(c)(1)(B) (emphasis added). FCC, the Office of Management and Budget ("OMB"), and the U.S. Government Accountability Office ("GAO") all maintain that the USF is a "permanent, indefinite appropriation." U.S. Gov't Accountability Off., GAO-24-10697, *Administration of Universal Service Programs Is Consistent with Selected FCC Requirements* at 7 (July 2024), https://www.gao.gov/assets/gao-24-106967.pdf [https://perma.cc/7EAC-GZ8E]; *see also* FCC, *Agency Financial Report: Fiscal Year 2025*, at 63 (Dec. 8, 2025), https://docs.fcc.gov/public/attachments/DA-25-1059A1.pdf [https://perma.cc/MEE5-2B4F]; Letter for Thomas M. Johnson Jr., General Counsel, FCC, from Mark R. Paoletta, General Counsel, OMB, at 6 (Apr. 18, 2018), https://fcc.news/sites/default/files/OMB-Legal-Opinion-USF-2018.pdf [https://perma.cc/FU6Z-9K4E]. Congress has also treated the USF as an appropriation insofar as it has exempted the USF from the Antideficiency Act. *See*

---

safety." *Id.* § 1611(b)(1)(D). At the threshold, the Attorney General has not designated Lifeline as a specified program excepted from the scope of section 1611(c). *See, e.g.*, Revised Specification Pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 90 Fed. Reg. 32,023, 32,025 (July 16, 2025). What is more, even if the Lifeline program could be characterized as "necessary for the protection of life or safety," it does not provide an in-kind service (it instead provides a monetary discount on telecommunications services), *see* 47 C.F.R. § 54.403(a), and it is expressly conditioned on the recipient's income or resources, *id.* § 54.409(a).

Universal Service Antideficiency Temporary Suspension Act, Pub. L. No. 108-494, §§ 301–302, 18 Stat. 3998 (2004).[9]

This understanding is consistent with GAO's general practice for fee-based programs. According to GAO, "a statute makes [a permanent] appropriation if it (1) authorizes the collection of fees, and (2) makes the fees available for expenditure for a specified purpose." GAO, *Principles of Federal Appropriations Law* 2-24 (4th ed. 2016). The USF meets both elements of this definition. First, federal law authorizes the collection of fees from carriers and certain providers of interstate telecommunications to support universal service. *See* 47 U.S.C. § 254(d). Second, federal law authorizes the expenditure of USF funds "sufficient" to "preserve and advance universal service." *Id.* § 254(b)(5).

Supreme Court precedent further supports the conclusion that Lifeline benefits are provided by appropriated funds. "Under the Appropriations Clause, an appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 144 S. Ct. 1474, 1480 (2024). Federal law authorizes USF expenditures for a designated purpose. *See* 47 U.S.C. § 254(b)(5). And USF funds are public money because "[t]he monies of the USF are federal funds." USAC MOU at 2; *see also Coudert v. United States*, 175 U.S. 178, 182 (1899) ("[P]ublic moneys of the United States are the revenues of the United States from all sources."); *United States ex rel. Heath v. Wis. Bell, Inc.*, 92 F.4th 654, 668 (7th Cir.) (holding that USF contributions are federal funds for purposes of the False Claims Act), *aff'd and remanded*, 145 S. Ct. 498 (2025).[10] Here,

---

[9] Congress has periodically and incrementally extended the USF's Antideficiency Act exemption. *See, e.g.*, Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 510, 140 Stat. 173. Section 254 also imposes a qualitative limit on USF expenditures: Only "sufficient" expenditures "to preserve and advance universal service" are authorized. 47 U.S.C. § 254(b)(5).

[10] The Fifth Circuit had previously reached a contrary conclusion, holding that USF contributions were not federal funds subject to the False Claims Act. *See United States ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 388 (5th Cir. 2014) (per curiam). Since that time, there have been material changes to both the relevant False Claims Act definition and how USF funds are managed. Most pertinent for present purposes, USF funds are now housed in the Treasury rather than in a private bank account. These factual developments strengthen our conclusion.

USAC collects USF fees from carriers on behalf of FCC under federal law. *See* 47 C.F.R. §§ 54.701(a), 54.702(b); 47 U.S.C. § 254(d). Those fees are then held in the U.S. Treasury. USAC MOU at 3, 13. And that placement is significant considering the "Appropriations Clause applies to money 'drawn from the Treasury.'" *Cmty. Fin. Servs.*, 144 S. Ct. at 1481 (quoting U.S. Const. art. I, § 9, cl. 7). These considerations show that the USF is an appropriation.

### 3.

Even if the USF were not a congressional appropriation, Lifeline would still be a "benefit for which payments or assistance are provided . . . by *an agency of the United States*." 8 U.S.C. § 1611(c)(1)(B) (emphasis added). FCC is an agency of the United States, 47 U.S.C § 151, and it provides benefits through the Lifeline program that it established, *see* 50 Fed. Reg. 939. To be sure, several steps occur between the Lifeline program's origin and the consumer's receipt of the benefit, but none of those steps severs the ultimate source of the payments: a federal agency.

Lifeline's regulatory structure makes clear that a federal agency ultimately provides its benefits. Federal funds pay for the Lifeline program. *See* USAC MOU at 2–3. Additionally, FCC requires providers of interstate telecommunications service to contribute to the USF, 47 C.F.R. § 54.706(a); specifies the amounts they owe, *id.* § 54.709(a); pursues them if they fail to pay, *see id.* § 54.713(a); and decides how to spend USF funds, *see* 47 U.S.C. § 254(b), (e). Lifeline providers are obligated, by accepting reimbursement from USAC, to apply the discount to enrolled consumers. 47 C.F.R. § 54.403(a)–(b).

USAC's involvement in this process does not change the fact that a federal agency provides the Lifeline benefit. That is because USAC acts as FCC's agent under common-law principles. *See* USAC MOU at 2 ("USAC's sole purpose is to assist the FCC . . . as an agent and instrumentality of the FCC.").[11] An agency relationship arises if the principal and agent manifest "assent" that "the agent shall act on the principal's

---

[11] We have not been asked, and we do not answer, whether USAC complies with the Government Corporation Control Act, Pub. L. No. 97-258, subtit. VI, 96 Stat. 1041 (1982) (codified as amended at 31 U.S.C. §§ 9101–9110).

behalf and subject to the principal's control." Restatement (Third) of Agency § 1.01 (2006) ("Third Restatement"). The relationship between FCC and USAC fits that definition. Both entities manifested assent when FCC "appointed" USAC as the USF administrator and USAC accepted the appointment. 47 C.F.R. § 54.701(a); USAC MOU at 2. USAC acts on FCC's behalf by collecting and redistributing USF funds. 47 C.F.R. § 54.702(b). And FCC has day-to-day "oversight" of USAC's performance. USAC MOU at 2. USAC has agreed to comply with "orders, written directives, and other instructions" from FCC. *Id.* When USAC, an agent, acts within its scope of authority, its actions are attributable to FCC, the principal. Third Restatement § 7.03. USAC acts within its scope of authority and subject to FCC approval when it recommends disbursement from the Treasury and reimburses Lifeline providers for applying the discount to their enrolled consumers. *See* 47 C.F.R. § 54.403.[12]

That enrolled consumers receive the benefit directly from a Lifeline provider rather than from FCC or its agent does not negate the fact that FCC, as a federal agency, "provides" this benefit to recipients. The ordinary meaning of "provide[s]" is "to 'supply,' to 'furnish,' or to 'make available.'" *Wis. Bell*, 145 S. Ct. at 505 (first quoting *American Heritage Dictionary* 1411 (4th ed. 2000), and then citing 12 *The Oxford English Dictionary* 713 (2d ed. 1989)). FCC, through its agent, supplies, furnishes, or makes available funds that are used to subsidize a Lifeline consumer's bill. And more than one entity can be a provider. *See id.* at 507. Commonplace examples illustrate this principle. A "bank teller 'provides' an account holder with money, even though the recipient's employer deposited the relevant funds." *Id.* There, both the "originator of the money

---

[12] *See also Consumers' Rsch.*, 145 S. Ct. at 2508. If USAC did not "function subordinately" as an agent subject to FCC's complete "authority and surveillance," the delegation of authority to USAC to administer the USF could raise serious constitutional questions under either the private nondelegation doctrine or the Appointments Clause. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 881 (5th Cir. 2022); *see also Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1325 (D.C. Cir. 2024) ("For a delegation of governmental authority to a private entity to be constitutional, the private entity must act only as an aid to an accountable government agency that retains the ultimate authority to approve, disapprove, or modify the private entity's actions and decisions on delegated matters." (cleaned up)).

and the transmitter" can be said to have provided the funds. *Id.* Here, FCC is the originator of the money; Lifeline providers are merely transmitters of the funds. Thus, FCC provides the Lifeline benefit.

This conclusion is consistent with our Office's application of PRWORA to other federal programs. *See Harmonizing PRWORA and Section 214* at *8; *see also Status of the Refundable Portion of Certain Tax Credits as Federal Public Benefits*, 49 Op. O.L.C. __, at *17 (Nov. 19, 2025) ("PRWORA's prohibition extends to benefits indirectly provided to aliens"). The flow of benefits from Section 8 housing programs, for example, follows a pattern similar to those from Lifeline. Section 8 housing programs are designed to ensure that "eligible families can afford decent, safe, and sanitary housing." 24 C.F.R. § 982.1(a). The Department of Housing and Urban Development provides subsidies to "public housing agencies," and those subsidies are then relayed to landlords. *See* Housing and Community Development Act of 1980, Pub. L. No. 96-399, § 202(a), 94 Stat. 1614, 1626 (codified as amended at 42 U.S.C. § 1437f(b)(1)). By receiving the Section 8 subsidies, the landlord agrees to a "maximum monthly rent" that is charged to eligible families. 42 U.S.C. § 1437f(c)(1)(A). Even though the government subsidy is not directly transferred to the beneficiary, we have determined that the Section 8 benefit is a "Federal public benefit" under PRWORA. *See Harmonizing PRWORA and Section 214* at *8. So too with Lifeline. Although FCC does not directly confer the benefit to the consumer, Lifeline is nonetheless assistance provided to a qualifying individual by a federal agency.

## B.

For similar reasons, the Lifeline discount is a "Federal means-tested public benefit" under PRWORA. 8 U.S.C. § 1613(a). Accordingly, qualified aliens are ineligible to enroll in Lifeline unless they have been in the United States for at least five years with a qualified status. *Id.*

Start with the definition of a "Federal means-tested public benefit." That term reaches "any federal public benefit for which the eligibility . . . for benefits, or the amount of such benefits, or both, are determined on the basis of income, resources, or financial need." *Means-Tested Benefits* at *8. We have already established that Lifeline is a Federal public bene-

fit. *See* Part II.A. And eligibility for this benefit is determined by "income" or "financial need."[13] Recall, Lifeline is limited to "qualifying low-income consumer[s]." 47 C.F.R. § 54.409(a). To be a qualifying low-income consumer, one's income must be "at or below 135% of the Federal Poverty Guidelines for a household of [the relevant] size." *Id.* § 54.409(a)(1). Alternatively, one qualifies as a low-income consumer if a member of his household participates in a qualifying federal assistance program, including certain Tribal-specific programs. *See id.* § 54.409(a)(2), (b). These include nine qualifying assistance programs, all of which are conditioned on financial need. *See id.*[14]

## III.

As both a "Federal public benefit" and a "Federal means-tested public benefit," the Lifeline program must comply with PRWORA's eligibility and verification restrictions. Although PRWORA did not prescribe specific verification procedures, requiring a prospective enrollee to provide a Social Security Number would not, by itself, ensure compliance with

---

[13] Even eligibility for emergency assistance, as defined by 47 C.F.R. § 54.424(b), is conditioned on the survivor having suffered "financial hardship," *id.* § 54.409(a)(3)(i).

[14] *See* 7 U.S.C. § 2014(a) (limiting the Supplemental Nutrition Assistance Program to "households whose incomes and other financial resources . . . are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet"); 42 U.S.C. § 1382(a) (limiting Supplemental Security Income to individuals whose income is below certain thresholds); *id.* § 1396d(a) (limiting Medicaid to persons "whose income and resources are insufficient to meet" the cost of certain medical treatments); 24 C.F.R. § 960.201(a)(2) (limiting Federal Public Housing Assistance to "low income famil[ies]"); 38 C.F.R. § 3.3 (limiting the Veterans and Survivors Pension Benefit to persons whose income is below the specified threshold); 25 C.F.R. §§ 20.300(b), 20.303(a) (limiting Bureau of Indian Affairs general assistance to Indians who lack sufficient resources for essential items); 45 C.F.R. § 286.75(a)(1) (limiting tribally administered Temporary Assistance for Needy Families to families whose income is below a certain threshold as established by the Tribe); *id.* § 1302.12(c)(1)(i) (providing the Head Start benefit to families whose "income is equal to or below the poverty line"); 7 C.F.R. § 253.6(d) (limiting the Food Distribution Program on Indian Reservations benefit to households with an income below a level set by a state agency and to households composed only of members who are receive qualifying government assistance). Meeting the income standard is not the only way to qualify for Head Start, *see* 45 C.F.R. § 1302.12(c)(1), but Lifeline limits eligibility via Head Start to "only those households meeting its income qualifying standard," 47 C.F.R. § 54.409(b).

PRWORA. That is because non-qualified aliens and qualified aliens who have not resided in the United States for at least five years with a qualified status may be eligible for a Social Security Number. *See* 20 C.F.R. § 422.104(a)(2)–(3); *see also* 42 U.S.C. § 405(c)(2)(B). To comply with PRWORA, FCC must impose additional safeguards to verify eligibility for Lifeline benefits.[15]

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[15] SAVE is a federal, web-based tool that is administered by U.S. Citizenship and Immigration Services ("USCIS") and that is commonly used to verify an alien's immigration status. *See* Dep't of Homeland Sec., DHS/USCIS/PIA-006(d), *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* at 1 (Oct. 31, 2025), https://www.dhs.gov/sites/default/files/2025-10/privacy-pia-dhsuscis006d-save-october2025%20%28002%29.pdf [https://perma.cc/9A7A-Q4MJ]. FCC may use SAVE to verify alien eligibility for the Lifeline Program, provided that FCC adheres to a memorandum of agreement with USCIS guaranteeing "proper information usage and handling." *Id.* at 2.